Carmichael v. Balke. Mr. Merrick, we'll hear from you. May it please the court, my name is John Merrick and I represent the appellants Don Carmichael, KKMP, K-Family LP, Gary Emmett, and Barry Winston. I'm going to talk to you today about the compensation and damages on the MST-1000 unit from $884,156 to $4,000 initially. There are several elements of the district court opinion as well as the bankruptcy court opinion that place the change and the determination of clear error upon describing what Tim Cole, our expert witness, did as replicating a Chad Esso unit. I have before you some bench exhibits. The first one is a picture of the Chad Esso unit. That Chad Esso unit is depicted in what was Defendant's Impeachment Exhibit 34. Defendant's Impeachment Exhibit 34 was in fact utilized at trial of the case before Judge Bone. It also was offered as well as an exhibit at the Rule 59 hearing. Tim Cole testified unequivocally that he did not base his calculations on that unit. That's different. It has different components. He said that he based it upon the unit that's depicted in Plaintiff's Exhibit 18. Both of his calculations to build a new unit and to rebuild and repair the MST-1000 unit were based upon Plaintiff's Exhibit 18. That testimony is cited within the briefs. And that's where the district court hinged its opinion saying that the bankruptcy court, Judge Isker, concluded that the Chad unit was the one that was being built and we were building two brand new units. If you take a look at the bench exhibits, which I have put in front of you, the second exhibit is Exhibit 18. That's what Mr. Cole testified he was building. The third exhibit is Exhibit 127, which is the status of the MST-1000 unit as of July 29, 2013, when the Bahlke group, the appellees, were inspecting it without the presence of my clients. The third exhibit is Exhibit 13, which shows the condition of the unit as it was returned on August 1. And the fourth exhibit is clear pictures of that same exhibit as of August 1. It was totally destroyed. The exhibit, which is Proposal Tracking Form, Plaintiff's Exhibit 119 and 120, illustrate the difference as to how the damages were calculated by Cole. Exhibit 119 was building a new unit based upon the same parts that were in Plaintiff's Exhibit 119. Exhibit 120 was repairing that unit. And that begs the existential question, if Judge Rosenthal and Judge Isker are correct in that we're building a CHAD unit, how can you build a CHAD unit using the existing parts in Exhibit 18 that are found in Dayton? Cole testified he's using the same ferrite transmitter. He's using the same skid, and that's the basis of Plaintiff's Exhibit 120. He's using the same chiller. He's using the same waveguide. But to assemble all of that, you have to incur costs. And that's where Judge Isker, the second judge to hear the case on the Rule 59 motion, made a mistake. He said we didn't prove any assembly damages. He said what we proved was building a brand new CHAD unit. I pointed out in the brief the differences between the evidence in the record as to what constituted Exhibit 18 and what constituted the CHAD unit. Cole testified specifically that with respect to the first bench exhibit that all of these units with the blue centrifuges are part of an Alpha Laval unit. He did not replicate those costs or charges in the specific calculations that he made. So where are the assembly damages alone? Let's set aside the microwave. Let's set aside the chiller. They're in Plaintiff's Exhibits 119 and 120. Mr. Cole supplied two prime controls and the PI&D chart, which is the instrumentation, piping and instrumentation charts, as well as pictures of the unit to build, which was Exhibit 18. And his testimony shows that that was supplied to Prime Controls. Prime Controls is a large manufacturer and builder of commercial equipment. They have certifications to be able to do this. That's why the quote was put together by Prime, which is the last, second to the last bench exhibit, ROA 624-86. In that quote, there's a quote for assembly. And if you'll see in the descriptions, first, this quote is for 349,500. That's to build it new. If you look at that, the first line item is fabrication of a SCID platform. Cole testified that when you take out that fabrication of a new SCID platform, but you use what's in Dayton, the assembly charges quoted by Prime Controls are reduced to 174,750. And so there's no new SCID being built in the used parts of Dayton. But what you can tell from the Prime Controls, which quote, what's going on here is installation, item three on page one, installation of an applicator, installation of a waveguide, page number five. And it goes through all of the installations that's being done by Prime Controls for this quote. And then it says, exclusions, applicator will be provided by other, waveguide will be provided by other. Cole specifically testified that this figure of 174 was an assembly figure to be able to put this together. In order for us to reverse, we'd have to find clear error. Is that, is that correct? Excuse me? You would have to find that there was a clear error in order for us to reverse. Is that correct? Or to give you the one that you want? Yes. Yes, because What is your best argument that there is a clear error here for us to resolve? There's no clear error here. This is what was presented before Judge Bohm. And Judge Bohm made a determination based upon these assembly charges and the cost to repair the ferrite transmitter, as it existed, that the cost of rebuilding the MST-1000 was $884,156. Judge, so he had a basis to be able to make that determination. Judge Isker came back and said, oh, no, there's clear error. You were building the CHAD ESSO unit. You were not building the MST-1000. But you can't build the CHAD ESSO unit if you're using the old parts that are being rebuilt. Something that's, so at a minimum, the assembly charges testified to Cole of 174, 750 should have been awarded by the court. And Judge Isker should have awarded that as well. There was no basis to overturn what Judge Bohm did if he had an adequate record and basis to do it. And he did. There's no person that's more qualified than Tim Cole to have put together this analysis and these estimates. Tim Cole's company purchased TAI. TAI is Transamerica Automation, Inc. What you can see from the district court opinion is that the district court grossly misunderstood the value of what TAI was and the CHAD unit was to the MST-1000. They didn't understand the technology. Judge Bohm did. How do you know that? Well, from the record, if you look at Exhibit 81, Exhibit 81 is actually a schematic that was recovered from Basics Records, and it shows the applicator. And the design block on the lower right-hand side, Transamerica Automation, Inc., Imperial Petroleum Recovery Corporation. This is what Basic and Bauke were using to build their skid in competition with us during the course of the bankruptcy itself. If you go to Exhibit Number 97, which is at ROA 62317, you'll see on the second page of that that it says and that's, again, that's the work file that Bauke is utilizing to build his own MST like ours. It says on that page, if a similar or identical list previously item manufactured, it says mounting applicator on skid for Exxon CHAD project. So they're using the basic same diagrams. They're using the same PID. They're using the same information. And that's why it was important because if you're given the task of rebuilding a car wash or a car's automated systems, you need the instrumentation. You need to know what the logic control board will do and how you program that PLC, which is the programmable logic controller, so that it'll operate the machine. Will the car wash first wash the car or will it blow dry it first? You've got to program that. Mr. Cole's company purchased TAI. They had the PLC code. He testified that the PLC was damaged. It was not operable and that the wires to it had been cut. And as a result, it would be cheaper for them to simply build a new PLC than it would be to go back and recreate an older unit. If they were trying to recreate an old computer, they'd have to source the parts. They'd have to have the engineering. And he testified that that was a cheaper alternative was simply to put a new item on. That's the only new item that's listed within Exhibit 120 for rebuilding it. But that was the only new item that was cited by Judge Rosenthal in saying that we were building a new unit. So if you simply compare and look at the prime control quotes and what Tim Cole testified to, you'll find that he was rebuilding based on Dayton and not rebuilding a Chad unit. The other thing I wanted to address was whether or not he was going to build something that was operating. The ferrite transmitter, for example, the Springer testified that prior to and during the refurbishment, Amtrak spent $8,000 to $10,000 in rebuilding that microwave. Amtrak, in fact, submitted a proof of claim to the bankruptcy court for services between 2011 and 2012 for over $18,000 for making that microwave work. There's no evidence in the record whatsoever that they were making the of taking the used microwave and rebuilding it of $20,000 was fair. It was within $2,000 of Amtrak's that's already part of the record. So at a minimum, the parts that were being rebuilt should have been awarded. The ferrite transmitter, $20,000. The waveguide, the chiller, $15,000. The 174, those should have been awarded. There is no evidence in the record that Mr. Balke had any expertise whatsoever with respect to rebuilding a microwave or a chiller. And the prime controls document that I gave you in the bench exhibits shows that they're certified in these matters. They have to test the piping. They have to test the electrical. To say that you can't have a single new unit or, excuse me, new part incorporated into this build is something that would require this court to rule that you can't replace wiring. You have to use the cut wiring and splice it. You have to put it back together. Finally, Cole testified that he was going to bring it to operable condition, not to better running, operable. That's at ROA 58104. Finally, I wanted to reserve five minutes for rebuttal. I wanted to address the declaratory relief as well. We were granted declaratory relief based upon the transfer and assignment of patent rights by Mr. Balke and his lawyer to a company called Ultratech. Judge Bone found that that was something that was appropriate. And he declared that any transfer to Ultratech of our technology was void. Judge Isker said that they, in his opinion, said that there, and it's cited in the brief, that there was no basis for their claim that we weren't entitled to that relief, that they didn't prove their patent case at all. And Judge Isker also, in ROA 440005, said that his rulings were not going to change any inconsistent findings of Judge Bone. Thank you. Thank you. You've saved time for rebuttal. You're now from Ms. Bain. May it please the court. I'm a little stunned this morning that, first of all, I'm Joan Bain. I represent the defendants, Tommy Balke, TEB, JES, Inc., and Ultratech. Ultratech, I think this is in our brief, too, is basically a defunct company at this point, waiting for this case to end so that it can be dissolved. I'm a little stunned this morning that, despite all the arguments in the appellant's brief that there were still two units, were focused only on this second refurbishment unit. I just want to confirm for the record and happy to answer any questions about this allegation in the brief that there were two units, that there never were two MST units in the bankruptcy estate. All of the evidence by anyone with firsthand knowledge is that there never were two units and that the only unit that existed was the demo unit, which was 12 years old, not functioning very well, and not fit for resale. Before we get too far down the road, can we talk about a jurisdictional question that I have? Certainly. And I'm not sure if you all have noticed it or if your friends on the other side have But this is odd. It's an odd procedural posture where you've got a Rule 59. I want to sort of tell you what I understand, and then you can tell me where I'm misunderstanding it. So the Rule — your clients filed the Rule 59 motion in February of 2018. Correct. Then you noticed an appeal in March of 2018, obviously divesting the bankruptcy court of any jurisdiction to adjudicate that 59E motion. Correct. Then the next month, in March of 18 — Eric is also in March of 18 — there's this about what should be happening. Is there a district court jurisdiction? Is there a bankruptcy court jurisdiction? The way I understand the briefing you all filed in 2018, everyone seems to agree, leave the 59 motion on ice in the bankruptcy court. The district court has jurisdiction. Let's do it in the district court. So the district court proceeding goes on, goes forward, for a while. In fact, over a In September of 2019, it's not even obvious to me. I can't find it, so maybe you can tell me it's in the record. Somebody suggests to Judge Isker, hey, we should go back and look at this Rule 59 motion that's now — I'm not doing my math well — but 18 months old. And Judge Isker makes some comment, which I'm not sure if your client asked for or what, that it potentially raises a substantial issue. Judge Isker says something to that effect, and then you wait four months to tell the district court, hey, this should — we need a Bankruptcy Rule 8008B indicative ruling. Did I misunderstand anything? I apologize for the length of that, but I just want to make sure we're clear. I think you understand that correctly, and your timeline is correct, but there's a few missing critical facts, I think, that I'd like to add. Sure. First of all, the reason that the appeal was filed is it was the absolute last day to file the appeal. There was pending before Judge Baum a motion to reconsider, and he actually signed an order, but he had no jurisdiction to do it. If you look at Judge Rosenthal's remand order, which is at Record on Appeal 17856, she actually agreed that there were two indicative rulings, and when it was originally brought to her attention during that early briefing in the district court, it got set aside while everybody was arguing about what should be in the record, and so it just sort of got forgotten. What tipped it back off in September of 2019 was that the appellants had begun executing on the judgment. They had made two executions, and we filed a motion to stay the execution, and by that time, Judge Isger had the case. As you know, part of our burden in filing a motion for stay is to show a reasonable likelihood of success on appeal. So during my argument on the motion to stay, I raised that I thought we had a reasonable likelihood of success on appeal of the appeal of the dismissal order, and he agreed and on his own went into the statement that he was going to on his own tell Judge Rosenthal that he thought the case should be remanded for consideration on the merits. There's two reasons why it took me four months to actually file the motion with Judge Secondly, there was a dispute over the record in the appeal before Judge Rosenthal, and she entered an order directing that the first record that was on file be set aside and the clerk submit a new record. So I had no record in her court to refer to, and so once the record was filed, I actually filed my first motion to remand, referencing both the record that had been stricken and the trial court record, hoping that would help the court find the documents relevant to the argument. So can I just pause you real quick because I want to make sure I understand what you're talking about with the records. Under 8008, you don't need that, right? All you need to tell Judge Rosenthal is, hey, Chief Judge Rosenthal, the bankruptcy judge says there's a substantial issue under 8008A.3, so can you please send it back to him so that we can do the 59 motion? I'm not sure I understand the relevance of that. Yeah. I think if the motion to remand was far more detailed than just that, and the motion, the Rule 59 motion, dealt with much more than just the dismissal order. And we were requesting Judge Rosenthal to send the whole Rule 59 motion back, which included the merits of the claim, and so the motion to remand included the excerpts from that Rule 59 motion on what was relevant to the remand. I apologize for taking as much time on this. I realize there's a lot of facts that we need to cover, so can I just ask you two final questions on it, and then we'll move on to whatever you'd like to talk about. Certainly. Number one, it strikes me, and tell me I'm wrong about this, that in bankruptcy, in particular where there's, I realize you're challenging this in a collateral appeal, but there's, as we sit here today, there's a finding that your clients violated the automatic stay and were converting property that was properly part of the estate. And in that circumstance, in addition to the fact that we have the need for speed in bankruptcy for obvious financial reasons, this delay seems unreasonable to me. But two, perhaps you can point me to some authority that says, no, no, no, four months, well, I mean, really, it's not even four months, right? It's four months from the statement that Judge Isker made to when you noticed it to Judge Rosenthal, please remand. But it's really like years since the Rule 59 motion is filed, and then we go back for a second bite of the apple to undo a $2 million judgment. It just, it seems quite odd. So if there's something that you can give me just to allay that concern, we can move on to whatever you want to do. Well, in the meantime, during that year, Judge Rosenthal had abated that appeal. So there wasn't anything that could be filed in that appeal because we'd gone off on this tangent on this separate appeal having to do with what was in the record on appeal. So that was one problem. There were, she was not, that appeal, the 731, was, had been abated. Secondly, I don't really think there is anything, I mean, it's unusual because of the timing, but I don't believe Judge Isker actually found that my client's converted property. He did say there was a finding of violation of the stay by moving the chiller, just the chiller, from the skid or wherever it was, which nobody really knows where it was at that point, to set it on a mock-up, not a real MST, but a mock-up that was being built by Mr. Balki. And I'm happy to go into all the facts that show that he wasn't converting it. But the evidence is undisputed that that chiller was returned to the plaintiffs. And Judge Isker's opinion comments that the only thing that really possibly could have been a violation of the stay was the movement of that chiller, but that they got it back. And that's his justification for having reassembly damages rather than any other type of damages because they had all of the equipment back, all of the property back. That is, I guess, also should point out that Judge Isker was concerned that there was no direct evidence in the record anywhere that there was ever an intentional violation of the stay. And he was concerned about that, but because it was a Rule 59 motion, he deferred to Judge Bohm's finding on that. But he disagreed with what was allegedly taken. Did I answer your question? Very thoroughly. I'm grateful. Thank you. Let me start by talking about this issue about what Mr. Cole testified to and what Mr. Cole didn't testify to. Cole's refurbishment numbers are not what Mr. Merrick just said they were. And he testified numerous times during the trial. And just as an example, I'll read one into the record because I think it is illustrative of how wrong that interpretation is. Sorry. Trying to get to the right place. Okay. Mr. Cole testified unequivocally on multiple occasions that he was building two new machines to the TAI specifications. One such place is in Record on Appeal 3521 to 3522. That was his trial testimony in April of 2016. On cross-examination, Mr. Cole was asked, all right, you were building two new machines, one with all new parts, one with what you can salvage from Dayton, right? Correct. It's no refurbishment. You're building two TAI units, brand new, and one of them you are using as many parts as you can find from Dayton. That's the fact. Correct. I also would refer the Court to Record on Appeal 3706 to 3707. That's more Cole trial testimony. And you can find summaries of his testimony on this issue in the record. At the plaintiff's, I mean, defendants replied to plaintiff's closing brief because it was raised before Judge Isger in closing as well. And that document at Record on Appeal 38206 has a summary of many other places where Mr. Cole on cross-examination admitted that he was building this to TAI specifications. He was including all the certifications that did not exist on the demo unit. And in the PowerPoint, which I have provided to you all today as a bench exhibit, some of Mr. Cole's testimony is included, but not all of it is there. We were limited in our time for closing, so I couldn't read everything. But it's Mr. Cole's discussion about what he was building, I believe, is towards the back. Second, I would like to address this argument that Mr. Merrick has made about what was Plaintiff's Exhibit Number 120, I think, which was I don't mean to interrupt again, I'm sorry, but can we talk about this exhibit? Sure, sure. So that exhibit is the SOChad unit. It was built in 2003 for Exxon SO, what my client refers to as a super major during his testimony. They have very high standards for what they buy. It was a custom-built unit. It was built and sold to them way back then. That is a picture of that unit in 2003. And part of the reason and the relevance of that picture is discussed thoroughly by my client in his testimony, which is summarized beginning, I think, at page 40 of the PowerPoint of all the differences between the demo unit and the CHAD unit. And there's a few pages in there also about the differences between the MST-150, which is the one that was supposedly cannibalized. But it talks about there was differences in the certifications. There was differences in that everything was redundant on the CHAD unit. That unit was designed to operate 24-7 on its own automatically. There was special piping. There was a special waveguide. There was special power controls. I mean, just nothing like the demo unit. And he also testified, you know, the demo unit, they took old parts that had been in storage in a Quonset hut at another facility, transported them to Mr. Balky's facility and said, Can you make this work so that we can conduct demonstrations, so that we can have potential clients come see how the technology works and we can then hopefully get orders to build new units like the unit we built for Exxon. They did the demos. They did several demos. And there's lots of testimony about the demos. But they never were able to sell a unit, which is one of the reasons that the plan was denied. The demo unit, there's multiple documents in the record and testimony in the record. From the only three people who actually had any firsthand knowledge about what was at Mr. Balky's yard, Mr. Springer, Mr. Boulware, and Mr. Balky, that the demo unit was constantly in need of repair. The pumps had failed. They had to substitute a rental pump. The wiring had been cut when it came back, when he got it from the Dayton facility. The wiring on the parts that had come back on the MST-150 had been cut. In fact, there's even an exhibit in the record where there's an email from Ryan Boulware before one demonstration that they needed to move the demo unit closer to where they could get Mr. Balky's power, because the generator wasn't working. You don't have to move a unit to attach it to alternative power if it's independently powered. It wasn't. And a lot of the testimony is summarized in this PowerPoint. The only difference is that I have added the references to this court's record in red, because this was originally created for Judge Isger during his closing, so the first references were to the trial court record. So I'm hoping it is a tool to assist the court in manipulating this record. If you look at also these other exhibits, I want to make sure the court understands, like exhibit, and some of these pictures are in my brief, and I would ask the court to pay attention to the date of the pictures, because I think it's relevant. Exhibit 18, for example, is actually from 2012. One of the exhibits that's under seal in this case, the plaintiffs were able to get a custodian of records affidavit admitted to the trial. The affidavit was originally prepared for one of the state court proceedings between IPRC and Springer before this case ever existed. And that's where plaintiff's exhibit 18 comes from. So this is 2012, before the bankruptcy. The 127, we agree, is in 2013. In 2013, Mr. Springer and Mr. Bulwer were still operating at Mr. Balky's facilities. It was a Chapter 11 at that time. They were still conducting demonstrations, and there's a slew of exhibits that are referenced in our brief that say they were moving parts, replacing parts. Every time they did a demo, they had to get it up to speed, throwing old parts in the trash bin, et cetera. So what this picture at 127 in July of 2013 has nothing to do with exactly what the unit looked like in March or April of 2014 when it was converted to Chapter 7. But it is helpful because if you look closely, actually what's on the skid is almost the same. Not all the pictures are from the same distance or the same angle, but it's almost the same. And I do want the Court to recognize those big plastic totes that are in front. That's not IPRC's property. That's not part of the skid. That was the container that potential customers would bring their oil-contaminated materials in to be tested on the facility, and then they'd take it back. So it is in some of these pictures, but that's not in dispute here. I think Exhibit 113 was taken on August 1st. That's after the stay was lifted. And if you look closely, I know it's black and white. If you look closely, there's only one part of the skid that is different from what was in 127 and mostly what was in 18, and that's where the chiller would have been sitting. That's the only thing that's been removed. All the other parts are still there. It's just a different angle, so you don't have the front-on look. But if you look at Exhibit 128, this one's upside down, but it's a different angle. You can see from the back, all of the parts are still there, and they're all connected. That was August 13th or 14th of 2014. The stay's done in July. The stay was over in July when the assignment took place. Their clients testify that picture is in August of 2014. Now, yes, you can take it at different angles and make it look like there's something missing, but it's all the same parts. And if I have a second left, I did want to go back and address the Court to that, quote, If you look on page APX007204, Record on Appeal, I think that's 610033, and you look at the hardware and the quantity, they are buying new pieces. They're buying a new transmitter for $20,000, a tuner, and a wave guide. The only things that are blacked out that they're not buying new is the skid assembly. The skid assembly is a metal frame to hold the unit. There's no reason why that couldn't be reused. And then the PLC, which Mr. Merrick mentioned, he was going to get a new PLC because he thought it would be more expensive to buy a new one than to rehab the existing one. And there's a bunch of testimony in Mr. Cole's testimony about the software couldn't be updated and blah, blah, blah. But everything else is new. Thank you. We have your argument. Mr. Merrick, you have reserved time for rebuttal. There was no stay issued by Judge Rosenthal that stopped the filing of a motion under 8008C. Judge Rosenthal issued a stay after she decided to remand it and said, after a decision is made by Judge Isker, come back to me. That's why I'm staying it. It took years. There was no motion filed under 8008 that was considered by Judge Isker during the stay of execution hearing. That was a motion to stay execution. 8008 requires a motion and a statement from the court that they believe that the motion has merit, not what occurred with respect to the transcript of what happened before Judge Isker. So I believe that there was no jurisdiction for this court to even handle the Rule 59 motion until the court vacated the order of dismissal of the ECF 282, which was their motion for a new trial and their motion to amend the judgment. That is still a live order. It was never vacated. I brought it up again and again in the briefings before Judge Isker. We don't believe you have jurisdiction of this until you consider and give me a hearing on that dismissal order. And I've cited in my brief where we felt that we had great merit in challenging that dismissal, that it was an intentional failure of an attorney of record to sign a brief. It would be like a third party walking in and meeting my deadline and not somebody who's filed a notice with the court, an appearance with the court, or having ever appeared in the court case before. I have as my last document that is in the bench exhibits, Exhibit 40. Exhibit 40 appears in the record at 60194. That's an e-mail dated September 9, 2013, from Alan Springer to Mr. Tommy Balker, and he says this is during the bankruptcy. The next step is to refurbish the MST unit that came back from Brazil, probably using the extra skid or even shorten it in space as possible, then lease him the unit for operations while he decides whether to order a new unit or two. This is essentially the same deal we tried to get with Looney, except this company has money to pay for the lease. Why is this document even in existence if there was no Brazilian unit as of this time, if it had been parted out as Judge Isker said? It didn't exist, and that was the basis of Judge Isker's decision with respect to the Brazilian. It didn't exist. But what we do know from the testimony in the case is that Balky testified that in August of 2014, what did you keep? We kept what we were given. What was that? The container, microwave applicator, chiller, and waveguide. And he testified that they took those from the Brazil unit. Eugene Eddy, an employee of Mr. Balky, said, we were instructed by Balky to take those from the unit, and they put them in their shop and they were mounting them on a skid. The Brazil unit certainly existed. The bulware deposition examination occurred before this case and this cause of action even accrued. Neither Judge Rosenthal nor Judge Isker focused on the portion of the bulware deposition examination where he said that ceiling rings, Teflon windows, various parts of the waveguide, temperature and pressure sensors, the chiller, and some of the valves. That's all that was taken. What happened to the rest of it? The testimony at trial was that the container came back so damaged it couldn't be repaired. So damaged it couldn't be repaired. And then why would we have all of this testimony from Mr. Balky? First, those parts were given to me. That was the conclusion of Judge Rosenthal, that they were a gift, and that's why it didn't exist. Oh, then Balky also testified, no, those parts were sold to me. Judge Bohm compared both of those and said, you're lying. You took them. He testified in front of Judge Bohm that he didn't take anything. He testified in front of Judge Isker that they never put any of those parts in their shop. That's all I have here. Thank you. The case is submitted. This concludes the arguments for our panel this week, and we are adjourned.